**UNITED BOAT SERVICE CORPORA-TION, Libelant-Appellant,**

v.

**Stewart J. DAILEY, d/b/a Dailey Lighterage Company, Respondent-Appellee.**

**No. 304, Docket 23882.**

United States Court of Appeals Second Circuit.

Argued April 2, 1956.

Decided April 20, 1956.

In this admiralty suit for salvage services, the trial judge made the following findings of fact and conclusions of law:

"Findings of Fact

"1. Libelant operates a ship repair and service yard at City Island. It owned the steel vessel Brig. Gen. Absalom Baird, 170 feet long, which was moored between City Island and Harts Island, about 1600 feet off the shore of City Island. Its mooring tackle consisted of fifteen fathoms of 1½ inch stud-link bar chains secured to a permanent mushroom mooring weighing above seven tons, sunk in the mud. The Baird's anchor chain was shackled to a swivel on the end of the mooring chain. There was no person aboard and the Baird was a dead ship in every sense.

"2. Respondent, on November 24, 1950, owned three vessels, the Elmer S. Dailey, the Nellie Follette and the Mary & Melvin. The Elmer S. Dailey was 105 feet long with a 17.9 foot beam, drawing 8.5 feet, about 3 feet of freeboard and laden with 253 tons of coal. She was equipped with two stock anchors, one of 105 pounds and the other of 350 pounds, secured to 15 feet of ⅝ inch chain with 350 feet of 5 inch rope. She had a 210 horsepower diesel engine for propulsion. Her value was about $20,000 and that of her cargo was $4,600.

"3. The Nellie Follette was 100 feet long with 17.3 foot beam, drawing 7 feet and with a freeboard of two feet and laden with 150 tons of sand worth $350. She was equipped with a 210 horsepower diesel engine for propulsion and was worth about (107) $20,000. She was equipped also with two stock anchors, one of 150 pounds and the other of 350 pounds secured to 15 feet of ⅝ inch chain with 350 feet of 5 inch rope.

"4. The Mary & Melvin was 110 feet long with a beam of 24.1 feet laden with 420 tons of copper cathodes worth about $200,000 and drawing 8.5 feet of water with about 3 feet of freeboard. She was equipped with a 350 pound stockless anchor with 300 feet of 5 inch manila rope. She was without motive power and was worth about $4,000.

"5. None of the cargoes of the three vessels was the property of respondent.

"6. At Hellgate, on her voyage east from Perth Amboy, the Elmer S. Dailey came alongside the Follette and the Mary & Melvin. The two motor vessels

put the Mary & Melvin between them with the Dailey on her starboard and the Follette on her port and proceeded in that arrangement to Throgs Neck and thence toward the strait between City Island and Harts Island where the three vessels anchored near Harts Island on the Follette's anchor, secured to the Melvin's bow. They maintained this position until Saturday morning, November 25th.

"7. On November 25th the wind increased to force 7 and there were gusts in excess of that, some up to ninety miles per hour. Considerable damage was wrought to shore installations along that part of the coast of Long Island Sound. The (108) shore of City Island, facing the Baird, was rocky. During the forenoon the Dailey's captain left the other two and dropped his vessel back on the Baird's lee side—the starboard—and astern of the Baird. One of its crew tied the Dailey's headline to the stern bitt of the Baird. The Dailey operated its engines throughout the day to relieve any strain on the Baird caused by the position it had assumed with regard to it and rode out the storm in that position. The captain of the Follette dropped the Mary & Melvin aft of the Follette and hung its anchor on the Follette.

"8. The reason ascribed for the Dailey's maneuver by her captain was a desire to escape the wetting and discomfort that casting and fastening her own anchor would incur. He was a hardened seaman of long experience and at the trial the Court was convinced that this was a truthful explanation, however simple, and that it was the reason for his seeking the Baird as a mooring. He had tied to the Baird before—it had been in its position for a period of years—to await the turn of the tide. At all times the Dailey was seaworthy and under control with a motor that operated at the will of its master. It was never in peril.

"9. The three vessels rode out the storm in the situations described until the following morning when they departed to continue their voyage (109).

"Conclusion of Law

"1. The complaint is dismissed."

The judge's opinion reads as follows:

"The defendant's version of the conduct of its vessels during the storm on the afternoon of the 24th was never really contradicted. Libelant's employees were busy at their shore-side tasks. Admittedly they could not see the hawsers of any of the relatively distant vessels through the storm. They never did see the Dailey and the other vessel take up the position they were later described as occupying. The alleged issue of unseaworthiness of the respondent's vessels of which the Court sees no support whatever in the evidence, is made by libelant to depend upon the explanation of the change of position achieved by the respondent's vessels during the morning. The libelant professes the belief and theory that only a lack of sufficient anchors and lines accounts for the departure of the Dailey from her original anchorage. The Court, on the contrary, believes and did during the trial that it was a natural thing for the Dailey's master to do. It was certainly easier for him and his crew to put a rope on the Baird than it was to rig his anchor, cast it off and later pick it up. He had tied to the Baird before. The fact that he had no right to we regard as irrelevant in this case which is for salvage. The sufficiency of his equipment was demonstrated in fact by the finding that the Follette and her barge were held by similar anchor, chains and rope through the storm. The case (110) therefore to the Court is without a scintilla of evidence that respondent's vessels or any one of them ever was in danger. Furthermore, salvage service must be voluntary. The crewless Baird was incapable of voluntary service. In The Evolution [D.C.], 199 F. 514, an authority cited by libelant, the salvage allowance was made for apportionment with his crew to the owner of a ship whose crew had voluntarily rendered service to another vessel in peril. None of the elements constituting salvage service is present in this case. The Blackwall, 10 Wall. 1 [19 L.Ed. 870];

Elrod v. Luckenbac[h] [D.C.], 62 F. Supp. 935; The New Haven [D.C.], 159 F. 798; Puget Sound Tug & Barge Co. v. Waterman S. S. Co[rp]. [D.C.], 98 F. Supp. 123."

Gray & Wythe, Proctors, New York City, Horace M. Gray, New York City, of counsel, for libelant-appellant.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for respondent-appellee.

Before FRANK, MEDINA and WATERMAN, Circuit Judges.

PER CURIAM.

▉ The findings, amply supported by the evidence, are not "clearly erroneous." As the judge found that the respondents' vessels were not in peril, he correctly held that no salvage could be recovered.

▉ Although the policy involved in payment for salvage seems to be that of encouraging human aid to ships in peril, we leave open the question whether, absent any human aid, as here, salvage may be awarded.

Affirmed.